AO 91 (Rev. 10/12) Criminal Complaint

# United States District Court

_____NORTHERN_____   DISTRICT OF _____TEXAS_____

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

NOV – 6 2012

**CLERK, U.S. DISTRICT COURT**
By_____
Deputy

UNITED STATES OF AMERICA

V.

TONY HERNANDEZ (1)
JOHNNY ANGEL GAMEZ (2)
SERGIO PICASSO-NIETO (3)
MIGUEL QUINTERO (4)
AGNE VASQUEZ (5)
ANDRES VASQUEZ (6)
BALTAZAR VASQUEZ (7)
ROBERTO VASQUEZ (8)
MARIA REYNA VASQUEZ (9)

## COMPLAINT

CASE NUMBER: 3-12-MJ-**491.BH**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on or about <u>March 2011 to present</u> in <u>Dallas</u> County, in the Northern District of Texas defendant(s) did,

knowingly, intentionally and unlawfully combine, conspire, confederate, and agree together, with each other and with persons both known and unknown, to commit certain offenses against the United States, to wit: to possess with the intent to distribute and to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title _21_ United States Code, Section(s) _841(a)(1), 841(b)(1)(A)(viii) and 846_.

I further state that I am a(n) <u>Task Force Officer</u> of the <u>Federal Bureau of Investigation (FBI)</u> and that this complaint is based on the following facts:

See attached Affidavit of Task Force Officer Byron Boston, FBI, which is incorporated and made a part hereof by reference. Continued on the attached sheet and made a part hereof: XX Yes   No

_____
Signature of Complainant
BYRON BOSTON
Task Force Officer, FBI

Sworn to before me and subscribed in my presence, on this _6th_ day of _November 2012_, at Dallas, Texas.

IRMA C. RAMIREZ
<u>UNITED STATES MAGISTRATE JUDGE</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## INTRODUCTION

1. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), United States Department of Justice, assigned to the Dallas Field Division. I have been a Dallas Police Officer for approximately 15 years and have been assigned to conduct narcotic investigations for the past nine years. During the past nine years I have participated in numerous long term narcotic investigations conducted by the FBI, Dallas Police Department (DPD), Drug Enforcement Administration (DEA), and the Bureau of Alcohol, Tobacco, and Firearms (ATF). I used a variety of methods during these investigations, including, but not limited to, visual surveillance, general questioning of witnesses, the use of search warrants, confidential informants, undercover agents, pen registers, and Title III wire interceptions. I received specialized training in Title III wire interceptions from the DEA in December 2010. I received additional training in Title III wire interceptions form the Office of Enforcement Operations (OEO) in August 2012.

2. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is authorized by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

## BACKGROUND

3. In March 2011, the FBI initiated an investigation targeting a large-scale methamphetamine (ICE) and cocaine trafficking organization, hereinafter referred to as the Tony Hernandez Drug Trafficking Organization (HDTO) operating the Dallas-Fort Worth, Texas metropolitan area. Information received from confidential informants

suggested that the HDTO is involved in the illegal importation of large quantities of ICE

from the Republic of Mexico on a monthly basis. In addition, the HDTO is involved in

the illegal importation of multiple kilograms of cocaine as well. Once the ICE and

cocaine has been illegally smuggled across the border, they are transported to various

distribution locations in Dallas, Texas. The loads of ICE and cocaine are distributed to

members of the HDTO in exchange for large sums of U.S. currency.

4. In January 2007, the Dallas Police Department (DPD) and the Drug

Enforcement Administration (DEA) initiated an investigation targeting the (HDTO).

During the 2007 investigation, law enforcement officials identified Tony Hernandez as

the leader of the organization. Tony Hernandez gained the leadership role after his

brother, Gonzalo Hernandez, was murdered by members of Los Zetas Cartel[1].

Intelligence information gathered during an undercover operation revealed that Gonzalo

Hernandez was murdered by Los Zetas because he was also working with the Sinaloa

cartel. This intelligence was confirmed by various Sources of Information (SOI). Over

the course of the 2007 investigation, law enforcement officials learned that Francisco

Martin Vasquez, Jorge Vasquez, and Crystal Herrera were mid-level distributors of ICE

for the HDTO. A known female, related to Tony Hernandez, processed the ICE from

liquid form to crystal form at her home residence of 2737 Seevers Avenue, Dallas, Texas.

In September 2007, the investigation culminated with the seizure of approximately one

pound of ICE, 250 grams of cocaine, and $34,000 U.S. currency. Jorge Vasquez, Crystal

---

[1] Los Zetas Cartel is a criminal organization in Mexico dedicated to the international drug trade, assassinations, extortion, murder, kidnapping, car theft and other organized criminal activities. This drug cartel was founded by a small group of Mexican Special Forces, deserters and now included corrupt former federal, state and local police officers.

Herrera, and Rocio Jiminez were indicted in the Northern District of Texas for conspiracy to possess with the intent to distribute a Schedule II controlled substance (methamphetamine).    Jorge Vasquez and Crystal Herrera agreed to cooperate with law enforcement and were not detained.  Jorge Vasquez and Crystal Herrera both fled the country to Mexico and are currently DEA fugitives.  After Jorge Vasquez and Crystal Herrera fled, the investigation of the HDTO stalled.

5.  In March 2011, the FBI received information from an individual, hereinafter referred to as Confidential Informant #1 (CI-1), that Andres Vasquez, a.k.a. "La Cuera" received six to eight kilograms of ICE every week directly from Mexico.  CI-1 showed law enforcement Andres Vasquez's residence and stash location of 2806 Ramsey Avenue, Dallas, Texas.  CI-1 is an established source with the FBI.  CI-1 has been providing assistance to the FBI for approximately six years.  In exchange for CI-1's assistance, CI-1 receives financial compensation.  Information provided by CI-1 has been independently corroborated by investigators and determined to be credible and reliable. CI-1 can readily identify numerous types of controlled substances, drug paraphernalia, various types of drug packaging material, and concealment methods utilized by drug trafficking organizations.

6. On April 1, 2011, CI-1 traveled to 2806 Ramsey, Dallas, Texas to meet with Andres Vasquez.  While inside the location, CI-1 observed two AK-47 assault rifles, one 100 round drum magazine, and several 30 round magazines.  In addition, CI-1 saw an ammunition box containing 5,000 rounds of ammunition.  Andres Vasquez stated that

one of the AK-47's was his and that the other AK-47 belonged to his nephew "Tony," referring to Tony Hernandez.

7. In an effort to minimize CI-1's exposure in this investigation, agents recruited the services of an individual that will be referred to as CI-2. CI-2 is an established source with the FBI. CI-2 has been providing assistance to the FBI for approximately six years. In exchange for CI-2's assistance, CI-2 receives financial compensation. Information provided by CI-2 has been independently corroborated by investigators and determined to be credible and reliable. CI-2 can readily identify numerous types of controlled substances, drug paraphernalia, various types of drug packaging material, and concealment methods utilized by drug trafficking organizations.

8. On May 2, 2011, both CI-1 and CI-2 traveled to 2806 Ramsey to purchase one and a half ounces of ICE from Andres Vasquez. Prior to traveling to the location, CI-1/CI-2 and their vehicle were searched for contraband with negative results. CI-2 was provided $2,000 U.S. currency to purchase the ICE. CI-2 was not provided a recording device for fear that CI-2 may be searched by Andres Vasquez at the location. After departing the staging location, CI-2 was followed to the 2806 Ramsey residence. Upon arrival, CI-2 met with Andres Vasquez inside the location. Andres Vasquez provided CI-2.5 ounces of ICE in exchange for $1,500 U.S. currency. CI-2 left the location and relinquished custody of the ICE and the remaining $500 to FBI Special Agents. The ICE was submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 85 percent and weight of 40 grams.

9. On June 15, 2011, CI-1 placed a consensually monitored and recorded telephone call to Andres Vasquez to negotiate the purchase of two ounces of ICE. On June 15, 2011, CI-1 met with FBI Special Agents to conduct a controlled purchase of ICE from Andres Vasquez. FBI Special Agents searched CI-1 and CI-1's vehicle for contraband with negative results. CI-1 was provided a recording device and $2,000 U.S. currency to purchase the ICE. After departing the staging location, CI-1 was followed to 2806 Ramsey. Upon arrival, an unknown individual told CI-1 that a black SUV arrived prior to CI-1's arrival and that the occupants were "Narcos." Andres Vasquez told CI-1 that CI-1 may be under surveillance and wanted to know if CI-1 wanted to proceed with the purchase of ICE. CI-1 stated that he/she wanted to complete the purchase. Andres Vasquez provided CI-1 two ounces of ICE in exchange for $2,000 U.S. currency. CI-1 left the location and relinquished custody of the ICE to FBI Special Agents. The ICE was submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 99.3 percent and weight of 54.6 grams.

10.   In October 2011, DPD established CI-3 as a source. CI-3 was arrested by DPD for violation of the Texas Health and Safety Code 481.112, Manufacturing/Delivery of Controlled Substance in September 2011. CI-3 began cooperating with law enforcement agents immediately after CI-3's arrest. CI-3 agreed to cooperate for consideration on the Manufacturing/Delivery of Controlled Substance charge. CI-3 can readily identify numerous types of controlled substances, drug paraphernalia, various types of drug packaging material, and concealment methods utilized by drug trafficking organizations. In December 2011, FBI established CI-3 as a source. In May 2012, DPD

placed CI-3 in an inactive status and FBI closed CI-3 as a source based on unrelated criminal charges. Information provided by CI-3 has been independently corroborated by investigators and determined to be credible and reliable.

11. In December 2011, CI-3 told law enforcement officials Tony Hernandez previously supplied CI-3 with multiple pounds of ICE. CI-3 stated Hernandez was from Michoacán, Mexico and distributes approximately 20-30 pounds of ICE per week at a cost of $11,000 - $11,500 per pound. CI-3 advised the ICE and cocaine were transported to the United States by airplane to an unknown location. Hernandez, who is working for the La Familia Cartel[2], often traded ICE for firearms and would arrange for the firearms to be transported to Mexico. CI-3 advised that the last time he/she had knowledge of Tony Hernandez trading guns for ICE was July 2011.

12. On January 13, 2012, FBI Undercover Employees 4998 and 4999 (UCEs) traveled to Grand Prairie, Texas, to conduct a controlled purchase of approximately eight ounces of ICE from Tony Hernandez. Upon arrival, the UCEs searched CI-3 and the residence for contraband with negative results. The UCEs directed CI-3 to place a consensually-recorded telephone call to Hernandez, who was using cellular telephone number (972) 302-1921. They negotiated for eight ounces of ICE and Hernandez advised he would send someone to deliver the ICE. Approximately 50 minutes after the call to

---

[2]    According to the DEA's Office of Public Affairs, La Familia originated in the 1980's initially as a vigilante group to counter local street crime and law enforcement corruption in Michoacan, Mexico. In the 1990's, La Familia allied itself with the Gulf Cartel, specifically Los Zetas and the Osiel Cardenas-Guillen Organization. This alliance helped expand La Familia's drug trafficking operations. In 2006, La Familia became an independent drug trafficking organization (DTO), but maintains its alliances. La Familia is now considered one of the strongest cartels in Mexico and is the largest supplier of methamphetamine to the United States. La Familia is an extremely violent DTO, involved in narcotics trafficking, kidnapping, extortion, murder, and other criminal activities. They are involved in the distribution of cocaine and marijuana, but are heavily involved in the production of ICE in Michoacan, Mexico.

---

Hernandez, Baltazar Vasquez arrived at the Parham residence driving a white 2001

Chevrolet Suburban. Vasquez exited the Suburban and entered the residence carrying a

white plastic bag. CI-3 introduced Vasquez to the UCEs and handed the white plastic

bag to CI-3 for inspection. The UCEs observed CI-3 remove a clear plastic zip lock bag

that appeared to contain approximately eight ounces of ICE. CI-3 inspected the ICE and

handed the zip lock bag containing the ICE to the UCEs. UCE 4999 handed $5,600 in

United States currency to Baltazar Vasquez who counted it and placed it in his pocket.

Following the payment, UCEs arranged a future meeting with Vasquez at an apartment

complex located in southwest Dallas and then Vasquez left. The ICE was submitted to

DEA South Central Laboratory for analysis. The analysis confirmed the substance as

ICE, with a purity of 99.3 percent and weight of 221.2 grams.

13. On February 9, 2012, UCEs 4998 and UCE 4999 traveled to Grand Prairie,

Texas, to conduct a controlled purchase of approximately 16 ounces of methamphetamine

ICE from Tony Hernandez. Upon arrival, the UCEs searched CI-3 and the residence for

contraband with negative results. The UCEs directed CI-3 to place a consensually-

recorded telephone call to Tony Hernandez, who was using cellular telephone number

(972) 302-1921. They negotiated for 16 ounces of ICE and Hernandez advised he would

deliver it. Approximately 30 minutes later, Hernandez arrived at the residence driving

the white 2001 Chevrolet Suburban. Hernandez exited the Suburban and entered the

residence carrying a red Coca Cola box. CI-3 introduced Hernandez to the UCEs.

Hernandez handed the Coca Cola box to CI-3 for inspection. The UCEs saw CI-3

remove a clear plastic zip lock bag that appeared to contain approximately 16 ounces of

ICE. CI-3 inspected the ICE and handed the zip lock bag containing the ICE to the UCEs. CI-3 provided Tony Hernandez with $10,000 U.S. currency. The UCEs saw Tony Hernandez count the currency and rap it with rubber bands and place it in his pocket. During this transaction, Hernandez told the UCEs that he purchased six kilograms of cocaine before the "Super Bowl" and that he wished he would have purchased all ten kilograms of cocaine because he was already out. The ICE was submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 96.5 percent and a weight of 438.6 grams.

14. On May 13, 2012, at approximately 7:07 p.m., UCE 4936 placed a call to Miguel Quintero, who was using telephone number 214.854.8175. Quintero answered and UCE 4936 told Quintero that UCE wanted to buy the 30-inch wheels they had for sale and sample "some ICE." Quintero stated, "I'll have it for you to look at" and they agreed to meet at Quintero's residence the following day.

15. On May 14, 2012, UCE 4936 traveled to 2737 Seevers Avenue Dallas, Texas and met with Tony Hernandez, Miguel Quintero, and several other individuals. One of the unknown individuals went across the street to 2736 Seevers Avenue, Dallas, Texas and shortly thereafter Quintero came over. Miguel Quintero, Baltazar Vasquez, Roberto Vasquez, and several other individuals removed five, 30-inch wheels from the shed of 2737 Seevers. Miguel Quintero advised UCE 4936 to park his/her vehicle in the drive way of Quintero's residence at 2736 Seevers Avenue, Dallas, Texas. While the tires were being mounted, UCE 4936 saw Johnny Gamez distribute small quantities of marijuana to Quintero for immediate use. Agne Vasquez, along with an unidentified

female, arrived and sat on the front porch. Agne Vasquez lives at this location with Miguel Quintero. Once the tires were mounted, UCE 4936 asked Quintero if he had an ounce of ICE to inspect. Quintero stated he would obtain one and shortly thereafter Baltazar Vasquez arrived and provided Quintero with one ounce of ICE. UCE 4936 inspected the ICE, agreed to the quality, and told Quintero that UCE wanted to purchase an additional five ounces of ICE. Quintero spoke with Baltazar Vasquez and told UCE 4936 that they would obtain the ICE. Approximately ten minutes later, an unknown juvenile walked from 2737 Seevers and handed Quintero a plastic bag containing five ounces of ICE, who then handed it to UCE 4936. UCE 4936 inspected the ICE, agreed to the weight, and provided Quintero $5,000 U.S. currency. As Quintero was counting the U.S. currency, Roberto Vasquez walked from 2737 Seevers to Quintero. Quintero provided Roberto Vasquez a portion of the U.S. currency that UCE 4936 had just paid to Quintero. The ICE was submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 97.4 percent and a weight of 160.

16. On June 14, 2012, UCE 4936 placed a consensually monitored and recorded telephone call to Miguel Quintero, who was using telephone number 214-854-8175. UCE 4936 stated, "What's up with it bro. I'm gonna shoot down there tomorrow." Quintero responded by saying, "You want the same thing." UCE 4936 stated, "I want a 6 piece." Quintero stated, "I got you" and the conversation ended. UCE 4936 was advising Quintero that he/she would purchase six ounces of ICE from him on June 15, 2012. Quintero agreed to have the ICE ready and the conversation ended.

17.   On June 15, 2012, UCE 4936 conducted a consensually monitored and recorded drug purchase from Miguel Quintero in the block of 2700 Seevers, Dallas, Texas.   UCE 4936 then drove to the location and contacted Quintero on the telephone and told him that he/she was outside his residence.   Quintero exited his residence and advised UCE 4936 that he just called his cousin and that the cousin would be there in five minutes.   UCE 4936 returned to his/her undercover vehicle and waited.   Approximately five minutes later, UCE 4936 saw Baltazar Vasquez walking from the rear of 2736 Seevers and enter the residence.   Immediately after Baltazar Vasquez entered the residence, Quintero exited the residence and entered UCE 4936's undercover vehicle. Quintero handed UCE 4936 a zip lock bag containing the suspected ICE.   UCE 4936 inspected the contents, agreed to the weight, and paid Quintero the previously negotiated amount of $5,300 U.S. currency.   As Quintero was counting the currency, Johnny Gamez arrived in his Black Dodge Charger and parked directly in front of UCE 4936's undercover vehicle.   Based on the way Gamez parked the vehicle, UCE 4936 felt that he was providing security and counter-surveillance for Quintero.   For safety concerns, UCE 4936 exited his/her undercover vehicle and walked towards Gamez's vehicle.   Gamez exited and greeted UCE 4936.   After Quintero finished counting the $5,300, UCE 4936 departed the location. The ICE was submitted to DEA South Central Laboratory for analysis.   The analysis confirmed the substance as ICE, with a purity of 100 percent and a weight of 166.9 grams

17. Beginning in July 2012 to present, agents used several court-authorized Title III wire interceptions from the Northern District of Texas, Dallas Division to further the investigation into the HDTO.  The following wire interceptions were authorized:

| Target Telephone | Authorizing Judge | Dates Intercepted |
|---|---|---|
| 214.854.8175 (target telephone #1) | United States District Judge Reed O'Connor | July 27, 2012 to August 25, 2012. |
| 214.854.8175 (target telephone #1) | United States District Judge Jorge Solis | September 11, 2012 to October 10, 2012. |
| 214.642.9418 (target telephone #2) | United States District Judge Reed O'Connor | July 27, 2012 to August 25, 2012. |
| 214.642.9418 (target telephone #2) | United States District Judge Jorge Solis | October 5, 2012 to November 3, 2012. |
| 214.229.9506 (target telephone #3) | United States District Judge Jorge Solis | September 11, 2012 to October 10, 2012.<br><br>October 26, 2012 to Present |
| 214.780.9733(target telephone #4) | United States District Judge Jorge Solis | October 5, 2012 to November 3, 2012. |
| 214.690.1903 (target telephone #5) | United Stated District Judge Jorge Solis | October 26, 2012 to Present |

17. The court-authorized interceptions over the target telephones occurred in both English and Spanish.  The Spanish interceptions have been translated by either a Spanish-speaking contract monitor or a Spanish-speaking law enforcement officer.  This affidavit

references portions and summarizes calls in support of the requested search warrants. Not all pertinent conversations have been included in this affidavit.

18. On July 30, 2012, UCE 4936 contacted Quintero and negotiated the purchase of six ounces of ICE. Quintero agreed to deliver the ICE to UCE 4936. UCE 4936 contacted Quintero and advised that he/she was close to his residence. The court-authorized wire interceptions revealed that Quintero immediately contacted Roberto Vasquez's previous cellular telephone number of 214.477.8584 and asked Roberto Vasquez "Where you at?" Roberto Vasquez replied he was at the house. When UCE 4936 arrived at Quintero's residence, Quintero exited his residence of 2736 Seevers Avenue, Dallas, Texas entered the UCE's covert vehicle and handed UCE 4936 approximately six ounces of ICE. UCE 4936 immediately noticed Johnny Gamez was standing in the front yard providing counter-surveillance and security for Quintero by keeping a close watch on UCE 4936 during the transaction. When Quintero entered UCE 4936's covert vehicle, Johnny Gamez walked in close proximity to the covert vehicle and entered his own black Dodge Charger, which was parked parallel to UCE 4936's covert vehicle. UCE 4936 then requested an additional two ounces of ICE. Quintero exited UCE 4936's vehicle and immediately placed a phone call to Roberto Vasquez's previous cellular telephone number of 214.477.8584 and stated, "Where you at?" Roberto Vasquez replied, "Inside the house." Quintero told Roberto Vasquez to open the door. At that time, UCE 4936 believed Roberto Vasquez was inside 2742 Seevers, Dallas, Texas. A few moments later, Quintero exited his residence at 2736 Seevers Avenue, Dallas, Texas and delivered UCE 4936 the additional two ounces of ICE. The ICE was

submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 100 percent and a weight of 222.2 grams.

19. On August 6, 2012, UCE 4936 called Quintero, who was using **target telephone #1,** and negotiated the purchase of ten ounces of Methamphetamine (ICE). Quintero agreed he would have the ICE ready for UCE 4936 on August 7, 2012.

20. On August 7, 2012, UCE 4936 called Quintero and advised that he/she was approximately 20 minutes from Quintero's residence. Quintero stated, "Ok." (NOTE: Quintero immediately contacted Roberto Vasquez, who was using his previous cellular telephone number of 214.477.8584, but the call was not intercepted due to technical problems). UCE 4936 arrived at approximately 1:04 p.m., and Quintero advised UCE 4936 that "his partner would have it ready in thirty minutes." UCE 4936 advised Quintero that he/she needed a total of 12 ounces. Quintero advised that his partner was bringing ten ounces, and that he had two additional ounces of ICE in his residence. UCE 4936 advised Quintero that he/she would return to the residence in 30 minutes. At approximately 1:28 p.m., a Brown Chevrolet Van bearing Texas license plate DMZ-Z870 arrived at 2733 Seevers Avenue, and back in the driveway. A few moments later, a known female walked from 2737 Seevers Avenue, across the street to 2736 Seevers Avenue, carrying a white plastic bag. Immediately after this known female entered 2736 Seevers, UCE 4936 called Quintero and Quintero advised UCE 4936 that he was ready for UCE 4936 to return. Quintero further directed UCE 4936 to pull into the driveway.

21. At approximately 1:45 p.m., UCE 4936 arrived at Quintero's residence, and an unidentified male known as "Flaco" moved a trash can and directed UCE 4936 to park

in the drive way. As UCE 4936 pulled into the drive, the known female opened the door and stared at UCE 4936. UCE 4936 immediately recognized the known female as the elderly female on a Face Book photograph where she was holding an assault rifle. The known female stepped to the side of the door and allowed Quintero and Agne Vasquez to exit. UCE 4936 noticed "Flaco" kept adjusting his pants. When "Flaco" sat down on a chair, UCE 4936 observed what appeared to be a handle of a pistol protruding from "Flaco's" right jeans pocket. Both "Flaco" and Agne Vasquez provided counter-surveillance and security during this transaction. Quintero entered UCE 4936's undercover vehicle and handed UCE 4936 approximately 12 ounces of ICE. UCE 4936 provided Quintero $10,500 U.S. currency for the ICE. Quintero exited UCE 4936's covert vehicle and walked inside his residence with Agne Vasquez. UCE 4936 departed the area and met agents at a predetermined location where he/she relinquished custody of the ICE (Note: Quintero immediately contacted Roberto Vasquez, who was using his previous cellular telephone number of 214.477.8584 as UCE 4936 was leaving the residence). The ICE was submitted to DEA South Central Laboratory for analysis. The analysis confirmed the substance as ICE, with a purity of 98.2 percent and 332 grams.

22. On September 12, 2012, at 5:09 p.m., Roberto Vasquez using **target telephone #3** contacted his mother, Maria Reyna Vasquez, who was using telephone number 214.229.1590. Roberto Vasquez asked, "Can you get me one?" Maria Vasquez affirmed and asked "of the same ones?" Based on my training and experience in conducting narcotic investigations, I believe that Roberto Vasquez was asking Maria Vasquez if she could obtain one kilogram of ICE. Maria Vasquez agreed and the

conversation ended. Agents believe that Maria Vasquez and Sergio Piccaso-Neito are involved in a dating relationship and that Maria Vasquez would facilitate this transaction by calling Piccaso-Neito to obtain the ICE. Roberto Vasquez, using **target telephone #3**, then called Piccaso-Neito, using **target telephone #5**. Vasquez asked Piccaso-Neito, "Do you have those things that we got last time." Piccaso-Neito replied, "Ah, maybe, I can try to get it." Vasquez said, "Yes, we need one." Piccaso-Neito said, "But the other one is more expensive, I need the other one, just the yellow one." Vasquez said, "Can you get it?" Piccaso-Neito replied, "Yes, the yellow one." Vasquez added that he would first check with Tony, referring to Tony Hernandez. Based on my training and experience, as well as my participation in this investigation, I believed Roberto Vasquez was asking Piccaso-Neito for one kilogram of ICE.

23. Piccaso-Neito advised that he had "the yellow one," which refers to the quality of the ICE. Piccaso-Neito advised that he could supply the kilogram of ICE. Roberto Vasquez responded by saying he would confirm with Tony Hernandez.

24. On September 14, 2012, Roberto Vasquez using **target telephone #3** was contacted by 469.279.4769, a telephone number used by Johnny Gamez. Gamez asked Roberto Vasquez "You still got that 28?" Roberto Vasquez said no and that an unknown third party was going to pick it up. Gamez said, "I told Tony…..and he said you still got it and to get it from him." Gamez added he had "spoken to the boss man and he said for him to get it from him." Roberto Vasquez responded that he had told Nick already and that first come first serve.

25. Based on my training and experience in conducting narcotic investigations, and my knowledge of the HDTO, I believe Johnny Gamez was asking for an ounce of ICE. Gamez further indicated that the boss (Tony Hernandez) told him to get the ounce from Roberto Vasquez.

26. On September 16, 2012 Roberto Vasquez using **target telephone #3** was contacted by 214.299.1590, a telephone number utilized by Maria Vasquez. Maria Vasquez said, "Tell Tonino that there are new things." Roberto Vasquez affirmed. Maria Vasquez said, "Piccaso-Neito said to call him back." Vasquez affirmed again.

27. Based on my training and experience in conducting narcotic investigations and knowledge of the HDTO, I believe Maria Vasquez was notifying Roberto Vasquez that a new load of ICE had arrived and that she wanted Roberto Vasquez to tell Tony Hernandez ("Tell Tonino that there are new things").

28. On September 21, 2012 Roberto Vasquez using **target telephone #3** contacted Piccaso-Neito, who was using **target telephone #5**. Roberto Vasquez asked, "Did you get the other one" and Piccaso-Neito replied, "Yes."

29. Based on my training and experience in conducting narcotic investigations, and knowledge of the HDTO, I believe Roberto Vasquez was asking Piccaso-Neito if he had received the kilogram of methamphetamine and Piccaso-Neito affirmed.

30. On September 28, 2012, at 6:25 p.m., Roberto Vasquez using **target telephone #3**, contacted Piccaso-Neito, who using **target telephone #5,** and asked, "Can you give me another of the same?" Piccaso-Neito agreed. Roberto Vasquez stated, "He asked if you can bring the same one or with bigger chunks?" Piccaso-Neito said, "It is

the same one." Piccaso-Neito then asked, "Is it for now?" Roberto Vasquez replied,

"Right now." Piccaso-Neito said, "Ok."

31. Based on my training and experience in conducting narcotic investigations, and my knowledge of the HDTO, I believe Roberto Vasquez was asking Piccaso-Neito for another kilogram of ICE.

32. On September 29, 2012, at 10:08 a.m., Maria Vasquez, using telephone number 214.229.1590 contacted Roberto Vasquez, who was using **target telephone #3**, and advised that everything was ready. At 12:35 p.m., Roberto Vasquez, using **target telephone #3**, contacted Maria Vasquez and asked if she had "that" at her house. Maria Vasquez advised that she did and Roberto Vasquez stated he was going there now. Based on the previous wire interception referenced in paragraph numbers 30 and the relationship between Maria Vasquez and Piccaso-Neito, I believe that Piccaso-Neito left the kilogram of ICE with Maria Vasquez, and Roberto traveled to her residence to obtain the ICE.

33. On November 1, 2012, UCE 4936 was contacted by Miguel Quintero. Quintero asked UCE 4936 if he/she "needed any squares," referring to kilograms of cocaine. UCE 4936 asked Quintero how many "squares" he had, and Quintero indicated he was expecting a shipment of 20 kilograms of cocaine on Saturday, (November 3, 2012) or Monday (November 5, 2012). UCE 4936 advised Quintero would purchase multiple kilograms depending on the price. Quintero advised the kilograms would cost approximately $31,000 per kilogram. UCE 4936 advised Quintero to contact him/her when the kilograms of cocaine arrived.

34.  On November 2, 2012, UCE 4936 contacted Miguel Quintero.  Quintero advised that he had not received the kilograms of cocaine, but was expecting them on Monday (November 5, 2012).  UCE 4936 advised Quintero that he would purchase 6-7 kilograms of cocaine.  Quintero advised that UCE 4936 would be the first person that Quintero called when the kilograms of cocaine "make it to the house."

35.  On November 2, 2012, Quintero contacted UCE 4936 via SMS text message and advised that he needed help distributing ICE.  Quintero advised he would sell the ICE in kilogram quantities at a cost $22,500 per kilogram.  UCE 4936 advised Quintero that he/she may purchase a kilogram of ICE when UCE 4936 purchases the kilograms of cocaine.

36.  On November 4, 2012, CI-1 traveled to 2806 Ramsey, Dallas, Texas and met with Andres Vasquez.  Andres Vasquez advised CI-4 that he received a shipment of ICE. Andres Vasquez and CI-1 traveled to 2926 Alaska Avenue, Dallas, Texas and met with Piccaso-Neito and Maria Reyna Vasquez.  Over the course of the investigation, agents learned that Maria Reyna Vasquez is the owner of this residence.  When Andres Vasquez and CI-1 arrived at the residence, Maria Reyna Vasquez answered the door and allowed both Andres Vasquez and CI-1 to enter.  Piccaso-Neito escorted CI-1 and Andres Vasquez to the rear bedroom and Piccaso-Neito showed CI-1 approximately one pound of ICE, and indicated that he would sell 1 kilogram of ICE for $19,000.  Maria Reyna Vasquez stood behind CI-1 as Piccaso-Neito showed the ICE to CI-1.  Piccaso-Neito concealed the ICE in a shoebox in the rear bedroom.  CI-1 advised Piccaso-Neito that he/she would obtain the ICE on Monday (November 5, 2012).

37. On November 5, 2012, UCE 4936 contacted Miguel Quintero and negotiated the purchase of 3 kilograms of ICE. Quintero agreed to sell the ICE at a cost of $22,500 per kilogram. UCE 4936 was outfitted with an electronic audio/video recording device to allow the transaction to be recorded. At approximately 1:15 p.m., Quintero advised UCE 4936 that he wanted to complete the transaction at his dad's residence, located at 3115 Alaska Avenue, Dallas, Texas. UCE 4936 traveled to the location and Quintero entered UCE 4936's covert vehicle. Quintero advised that his cousin bringing the ICE. A few moments later, a silver Infinity arrived at the location. Quintero exited UCE 4936's vehicle and walked to the driver's side front door. UCE 4936 was unable to confirm the driver of the Infinity's identity. Quintero obtained a Louis Vuitton purse from the driver of the vehicle, and the Infinity departed the area. Quintero then reentered UCE 4936's covert vehicle and delivered approximately 1 kilogram of suspected ICE to UCE 4936. In exchange, UCE 4936 provided Quintero $22,500 U.S. currency. Quintero exited UCE 4936's vehicle and entered his residence. Dallas Police uniformed officers responded to the location and took Miguel Quintero into custody. Quintero gave consent to search his residence, and agents located the $22,500 of U.S. currency in the toilet bowl. A presumptive field-test was conducted by SAs which yielded positive results for the presence of methamphetamine.

36. On November 5, 2012, agents executed federal search warrants signed by Judge Paul D. Stickney for the following residences:

   a. 2737 Seevers Avenue, Dallas, Texas – Tony Hernandez and a known female have exercised care, custody, and control of this residence over the course of the

investigation. This location has been identified as a stash house location used to store large quantities of ICE, cocaine and U.S. currency derived from the illegal sale of narcotics.

b. 2736 Seevers Avenue, Dallas, Texas – Miguel Quintero and Agne Vasquez have exercised care, custody, and control of this residence over the course of the investigation. UCEs have conducted numerous controlled purchases of ICE at this residence over the course of the investigation. This location has been identified as a distribution location where multiple ounces of ICE are distributed from by Quintero. Agne Vasquez provides protection and counter-surveillance during the transactions. Agents seized 2 Glock handguns, 1 Colt Combat Commander handgun, 4 assault rifles, 2 shotguns, and 2 ballistic vests. Agents also seized a large assortment of .223, 7.62, and .45 ammunition.

c. 2733 Seevers Avenue, Dallas, Texas; a known female has exercised care, custody, and control of this residence over the course of the investigation. This female is related to Tony Hernandez. She assists members of the HDTO by storing quantities of ICE at her residence. She also wires illegal drug proceeds to Mexico as part of the HDTO. Agents seized four assault rifles and 1 handgun from the location.

d. 2742 Seevers Avenue, Dallas, Texas – Roberto Vasquez has exercised care, custody, and control of this residence over the course of the investigation. This residence is used as the primary stash location for large shipments of ICE.

37. On November 5, 2012, agents executed a state search warrant signed by District Judge Chatham at 2926 Alaska Avenue, Dallas, Texas. Agents seized

approximately 8 ounces of suspected ICE, an AR-15 Assault Rifle and a ballistic vest.

Maria Vasquez was arrested nearby the location and Piccaso-Neito was arrested at 2211

Sulphur Street, Dallas, Texas.

## CONCLUSION

37. Based on the foregoing facts, probable cause exists to believe that Tony

Hernandez a.k.a. "T", Roberto Vasquez a.k.a "Beto/Bubba", Andres Vasquez a.k.a  La

Cuera", Baltazar Vasquez a.k.a. "Balta", Agne Vasquez, Miguel Quintero a.k.a.

"Chuckie", Johnny Angel Gamez, Sergio Piccaso-Neito, and Maria Reyna Vasquez and

others known and unknown did knowingly, intentionally and unlawfully combine,

conspire, confederate, and agree together, with each other and with persons both known

and unknown, to commit certain offenses against the United States, to-wit: to possess

with the intent to distribute and to distribute 500 grams or more of a mixture or substance

containing a detectable amount of methamphetamine, a schedule II controlled substance,

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 846.

_____
BYRON BOSTON
TFO, FBI

Subscribed and sworn to before me on this the _____ day of November, 2012.

_____
IRMA C. RAMIREZ
UNITED STATES MAGISTRATE JUDGE