```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

UNITED STATES OF AMERICA      )    3:12-cr-392
                              )
v.                            )    Sentencing
                              )
MIGUEL QUINTERO               )    August 22, 2013
```

**BEFORE THE HONORABLE REED C. O'CONNOR**
*United States District Judge*
*In Dallas, Texas*

**FOR THE GOVERNMENT:**     **MR. JOHN KULL**
US Attorney's Office
1100 Commerce St
3rd Floor
Dallas, TX 75242
214/659-8600
Fax: 214/659-8803
john.kull@usdoj.gov

**FOR THE DEFENDANT:**      **MS. SHARITA BLACKNALL**
The Law Offices of
    Sharita Blacknall PC
5001 Spring Valley Road
Suite 400 East
Dallas, TX 75244
214/678-9111
Fax: 214/678-9144
info@blacknallfirm.com

**COURT REPORTER:**         **MR. DENVER B. RODEN, RMR**
*United States Court Reporter*
1050 Lake Carolyn Pkwy #2338
Irving, Texas  75039
*drodenrmr@sbcglobal.net*
Phone:  (214) 753-2298

    The above styled and numbered cause was reported by
computerized stenography and produced by computer.

1              (August 22, 2013.  Dallas, Texas.)

2                   THE COURT:  You're ready?

3                   MS. BLACKNALL:  We are, Your Honor.

4                   THE COURT:  All right.  Very good.  I've call case

5     No. 3:12, CR-392.  The United States versus Miguel Quintero.

6                   MR. KULL:  John Kull for the Government, Your Honor.

7                   MS. BLACKNALL:  Sharita Blacknall for the defendant.

8                   THE COURT:  Thank you, Ms. Blacknall.  It's good to

9     see you again.  Mr. Quintero, would you, please, acknowledge

10    your presence in court for the record by stating your full

11    name?

12                  THE DEFENDANT:  Miguel Quintero.

13                  THE COURT:  Quintero?

14                  THE DEFENDANT:  Yes, sir.

15                  THE COURT:  Miguel Quintero?

16                  THE DEFENDANT:  Yes, sir.

17                  THE COURT:  Okay.  Thank you, sir.  If I mispronounce

18    your name, I apologize.

19                  You appeared before me on February 28, 2013, at which

20    time you pleaded guilty to count one of the two count

21    indictment which charged you with a violation of Title 21,

22    United States Code, Section 846.  On that date I found that

23    your plea of guilty was a knowing and voluntary plea supported

24    by an independent basis in fact containing each of the east

25    evenings an elements of the offense.  You told me at that time

1  you understood the elements of the offense, agreed to the

2  accuracy of the factual resume, and admitted that you

3  committed all of the essential elements of this offense.

4          I found you guilty at that time.

5          Your plea of guilty was taken pursuant to a plea

6  agreement and I've reviewed that document and believe it

7  should be accepted, therefore your judgment and sentence will

8  be consistent with it.

9          Ms. Blacknall, did -- Ms. Blacknall, I'm sorry.  I'm

10  talking too fast.  Ms. Blacknall, did you and your client

11  receive in a timely man a copy of the Presentence

12  Investigation Report and the addendum

13          **MS. BLACKNALL:**  We did, Your Honor.

14          **THE COURT:**  Did you carefully review that with your

15  client?

16          **MS. BLACKNALL:**  I did.

17          **THE COURT:**  Mr. Kull, did you receive this documents?

18          **MR. KULL:**  Yes, Your Honor.

19          **THE COURT:**  Could you -- when you give me copies of

20  your objections, could you put them on one page, not on front

21  and back.

22          **MR. KULL:**  I've already talked to Ms. Crowley about

23  that and I will proceed in the future with that, Your Honor.

24          **THE COURT:**  They are all just stapled in this

25  document, so it makes it hard for me to read through all that.

1        **MR. KULL:** Yes, Your Honor.

2        **THE COURT:** Thank you for that. Okay. There have

3    been some objections filed in this case. Does the Government

4    wish to present any evidence with respect to these objections?

5        **MR. KULL:** No, Your Honor. But if the Court has any

6    questions, we have Task Force Officer Boston here to address

7    any concerns the Court might have with those objections.

8        **THE COURT:** Yes. Thank you. And, Ms. Blacknall, I

9    will turn the floor over to you. Do you wish to present any

10   evidence as to your objections?

11       **MS. BLACKNALL:** No, Your Honor. We stand on the --

12   no evidence. We just stand on the arguments made in our

13   objections.

14       **THE COURT:** Very good. I will overrule all of the

15   objections for the reasons stated in the addendum and the

16   Government's response.

17       I will just comment on a few of them. With respect

18   to the safety valve, I don't think he's entitled to safety

19   valve. Number one, there's just an arsenal of firearms

20   involved with your client. And then, number two, he is

21   obligated to give complete and truthful information to the

22   Government.

23       With respect to your objection to minor role, it

24   appears from my review of the Presentence Report and the

25   addendum that the documents are holding him accountable only

1    to the amount of methamphetamine that can be directly

2    attributable to him.

3          I think it is proper to consider in determining the

4    quantity of methamphetamine attributable to Mr. Quintero that

5    the telephone calls are accurate indicators of the drug amount

6    even though they are negotiations, so I would overrule that as

7    well.

8          And then again, I think I -- I don't think I've left

9    anything out.  As to the firearms, as I mentioned, there's an

10   abundance of evidence that they were at his home and that they

11   were there to further the drug trafficking crime and, in

12   addition, that there's an abundance of evidence that he knew

13   or had reason to know others were possessing and using those

14   firearms to further the drug trafficking crime.

15         So, I believe I've overruled all of the objections

16   and provided reasons for it.  Are there any other objections

17   that I've not addressed, Ms. Blacknall?

18         **MS. BLACKNALL:**  No, Your Honor.

19         **THE COURT:**  All right.  Then I will adopt the fact

20   findings contained in the Presentence Investigation Report.  I

21   will also adopt the Probation Officer's conclusions in

22   those -- in that document as to the appropriate guideline

23   calculations and determine that the appropriate guideline

24   calculations are as follows:

25         A total offense level of 39;

1          A Criminal History Category of I;

2          A custody rage of between 262 and 327 months;

3          A supervised release range of between 5 years and

4   life;

5          A fine range of between $25,000 and $10 million

6   dollars; and

7          A special assessment of $500.

8          Does the Government wish to be heard on sentencing?

9          **MR. KULL:**  Briefly, Your Honor.  Last Friday and

10  Monday of this week the PSR came to light in this court

11  because you got to hear from Task Force Officer Boston the

12  amount of time and energy spent on this investigation and it

13  was really focused on the defendant who sold to this man

14  multiple times.  I don't need to say the obvious about the

15  purity level of the methamphetamine.  You didn't even get to

16  hear the 17 transactions he had with his other client,

17  La Shawn Warren who as now pled guilty and admitted to those

18  transactions in his factual resume.  He was them main

19  seller -- one of the main sellers for the organization.

20          The Court heard about the arsenal that was kept at

21  his house to protect that dope.  You got to see him in the car

22  and the way he was acting.  In fact, on the last buy you heard

23  from him that he said the other organizations didn't have

24  stuff as good as they had.  They cut it and I think he said

25  they cut it and shit; right?  He was selling good product to

1    this man.  Thankfully for Detective Boston, we got it off the

2    streets.  But he was the main seller for the organization.

3        And the whole irony with Mr. Quintero was that in

4    paragraph 73 of his PSR, he said he tried methamphetamine and

5    didn't like it, but yet he is willing to sell it to

6    individuals he doesn't even know in order to turn a profit, to

7    keep living that life-style.  You also saw a photograph of how

8    he spent his money; right?  When he is on Agne Vasquez's

9    *Facebook* page where this man is holding a huge sum of money

10   and he is checking it out.  He is at a night club.  That's --

11   that's why he was selling product, who he -- he would go to

12   strip clubs.  That should make the Court sick.  We need to you

13   to protect us, Judge, from people like Mr. Quintero who live

14   to make money an off of other people's suffering and

15   addiction.

16       And it's wrong, the purity level, and the amount of

17   times he sold, I would submit -- obviously you make the

18   decision -- but to vary outside the guidelines.  What has he

19   done to show the Court he deserves something less than a

20   guideline sentence.  In my opinion, at least based on the

21   evidence as you heard it and what's in the PSR, there's

22   nothing that would warrant any type of departure for

23   Mr. Quintero.

24       **THE COURT:**  Thank you.  Ms. Blacknall, I'll turn the

25   floor over to you, ma'am.

1        **MS. BLACKNALL:**  Your Honor, we have previously

2    submitted two letters --

3        **THE COURT:**  And I've read both of them.  I apologize

4    for not telling you that in advance, but I read both of them

5    and I understand that they were translated or that they were

6    dictated, I guess, to someone else to write it, a younger

7    person to write it, so I've read both of those and thank you

8    for providing those to me in advance and again I apologize for

9    not telling you that.

10       **MS. BLACKNALL:**  That's okay.  Thank you, Your Honor.

11   And we have one witness that briefly wants to be heard --

12       **THE COURT:**  Okay.  Of course.

13       **MS. BLACKNALL:**  -- by the Court.

14       **THE COURT:**  Very good.  Ms. Quintero, if you would go

15   with your -- with the marshal, I'm sorry, and, Ms. Blacknall,

16   if you would call your witness, please.

17       **MS. BLACKNALL:**  I call Claudia Contreras.

18       **THE COURT:**  Yes.  Please come up, ma'am.  Ma'am,

19   would you, please, raise your right hand and be sworn.

20     (Witness sworn by the clerk at this time.)

21       **THE COURT:**  Very good.  Do you wish to proceed by

22   question and answer or just allow her to speak?

23       **MS. BLACKNALL:**  Your Honor, I would like to ask her a

24   few questions --

25       **THE COURT:**  Of course.

1    MS. BLACKNALL:  -- and then at the end I will give

2  her the opportunity if I haven't asked her a question that

3  elicited everything that she wanted to say, I would give her

4  the opportunity to --

5    THE COURT:  Thank you for that.

6  BY MS. BLACKNALL:

7  Q.  Can you state your name for the record, please?

8  A.  My name is Claudia Contreras.

9  Q.  Claudia, how old are you?

10 A.  I am eighteen years old.

11 Q.  How do you know Mr. Quintero?

12 A.  We met at school.

13 Q.  Is he your boyfriend?

14 A.  Currently, no.

15 Q.  All right.  But up until recently he was your boyfriend?

16 A.  Yes.

17 Q.  And when -- how old were you when the two of you guys met

18 each other?

19 A.  I was thirteen going on fourteen.

20 Q.  How old was he?

21 A.  He had just turned fifteen.

22 Q.  And how old is he now?

23 A.  Nineteen.

24 Q.  And up until I guess about a couple of months ago, you and

25 he were boyfriend/girlfriend?

1    A.  Yes.

2    Q.  And during the time period that you've known him, where

3    was he living and who was he living with?

4    A.  With his grandmother.

5    Q.  And was anyone else living there with him?

6    A.  His cousins and that's it.

7    Q.  Now, during the time period that you've known him, did

8    Mr. Quintero have any ways of earning money other than what

9    he's accused of here today?

10   A.  He would help his friends, you know, because -- install

11   stereos, work on cars, little stuff like that.

12   Q.  Does he pretty much know just about everything there is to

13   know about working on cars?

14   A.  Yes.

15   Q.  Have you seen him do that often to earn money?

16   A.  Yes, I have.

17   Q.  During the time period that you have known him, have you

18   ever seen him with any guns?

19   A.  No, Your Honor.

20   Q.  Have you ever seen him with any drugs?

21   A.  No.

22   Q.  Did he bring any of that life-style around you?

23   A.  No, never that I've known him.

24   Q.  Have you had an opportunity to observe him with the rest

25   of his family?

1   A.  Yes.  He was would just interact with his family and

2   talk -- normal family things that people normally do, you

3   know.  That's pretty much it.

4   Q.  And have you known him to be helpful with his grandmother

5   and his other siblings?

6   A.  Yes.  He would help his siblings with her daughter and one

7   of his parents needed money or anything like that, he would

8   provide that for them.  His grandma is sick and old, so he

9   would help her with her diabetes medicine, you know, take care

10  of her, ask if she needed something, little stuff like that.

11  Q.  Have you ever known Mr. Quintero to be violent towards

12  anyone?

13  A.  No, I have never seen him.

14  Q.  All right.  And he's never been violent toward you?

15  A.  No.  Never.

16  Q.  Tell the Judge a little bit about yourself.  Do you work

17  and are you in college right now?

18  A.  Yes.  I'm currently working a part-time job and I go to

19  school full-time.

20  Q.  All right.  And the reason that you and Mr. Quintero are

21  not together any more is not because you guys are upset

22  with each other or --

23  A.  Yeah.  It's not like we got into an argument, it's just

24  the situation he is in, it's pretty much impossible.

25  Q.  Has he pretty much lived in the Dallas area for as long as

1  you've known him?

2  A.  All the time I've known him and before he's always lived

3  in the Dallas area.

4  Q.  And have you ever known him to go to Mexico?

5  A.  No.  He was never -- that I know of.  Since I've known him

6  he has never gone to Mexico.  I believe he was like eight

7  years old or something is the last time he went.

8  Q.  Now, if Mr. Quintero is -- when he's released from jail,

9  do you think that he would engage in this activity that

10  he's --

11  A.  No.

12  Q.  -- engaged in?

13  A.  No, I don't think so.

14  Q.  Since he has been in jail, explain to the Judge the

15  changes that you've seen in him?

16  A.  He is actually more mature.  I see that charge.  We can

17  actually have a serious talk now.  He takes things a little

18  more serious than he did back then and he told me he wanted to

19  graduate in there, you know, get a diploma, get something, and

20  maybe go to tech school and get a title -- his title for cars.

21  Q.  Is there anything you would like to say to the Judge

22  regarding Mr. Quintero and what you think should happen to him

23  that I have not asked you about?

24  A.  Well, I just think, you know, everything you do has a

25  consequence.  Yes, I do see that.  But I feel like Miguel

1    didn't have a role model to tell him that, you know, this was

2    wrong or right.  They let him drop out of the sixth grade.  I

3    mean, who does that?  I really don't see.  You can see all of

4    his family is in jail, so I feel like he's just -- and he

5    doesn't -- he should be punished so hard.

6    Q.  All right.  And although you're the only person here

7    that's speaking here for Miguel today, are there other people

8    who are in the courtroom for him as well?

9    A.  Yes.  His family is right here.

10            THE COURT:  Thank you all for being here.

11   Q.  And pretty much I guess half of the gallery is filled up

12   with Miguel's family.  Is that correct?

13   A.  Yes.

14   Q.  And how does Miguel's family feel about him?

15   A.  They -- you know, they like him, he is sweet, he helps

16   everybody, they really appreciate him, they are worried about

17   him, they care about him, and they want him to come home as

18   soon as possible.

19            MS. BLACKNALL:  I'll pass the witness, Your Honor.

20            THE COURT:  Okay.  Thank you.  He doesn't need to

21   cross here.  That's fine.

22            MS. BLACKNALL:  Your Honor, we have no other

23   witnesses, Your Honor.

24            THE COURT:  Okay.  Then I want to give you an

25   opportunity -- would you please come back up with your

1    counsel.  I want to give you an opportunity to make any final

2    statements you would like and also provide your client an

3    opportunity to speak as well in whatever order you wish to do

4    that in.

5         **MS. BLACKNALL:**  Thank you, Your Honor.  Your Honor, I

6    just have a few just brief things that I would like to say to

7    the Court.  I would respectfully ask that the Court sentence

8    Mr. Quintero to a sentence that's sufficient but that is not,

9    you know, so severe that it's not necessary.

10        Mr. Quintero knows what he did.  He early on accepted

11   responsibility for his role in this activity and although he

12   did not provide all of the information to the Government that

13   the Government would like to have him to provide, the reason

14   that he didn't do that, Your Honor, is that he wanted -- he

15   gave them all the information about what he did.  He was

16   completely willing to give them information about other

17   people.  There was only person that he did not want to give

18   them information about and that was his cousin, Agne Vasquez,

19   who he grew up with, Your Honor, from the time that he was

20   little.  They were both raised by their grandmother.  They

21   grew up in a probably 300 square foot room together sleeping

22   in twin beds together for their whole life.  And so he didn't

23   want to be the cause of Agne Vasquez getting convicted of

24   whatever, you know, his role was.  He just wanted to accept

25   responsibility for his role but he didn't want to be the cause

1    of Agne being convicted or anything that happened to Agne as a

2    result of anything that he said.

3         So although I understand and Mr. Quintero

4    understands, you know, what the rules say that he's supposed

5    to give as much information to the Government as they're

6    asking him for, he just wanted the Court to know that with

7    respect to that one person he just could not bring himself to

8    give them the information that they were asking about and he

9    forbade me from giving them any, you know, of that -- of that

10   information as well.

11        With respect to the -- his guideline range, Your

12   Honor, I don't think that his guideline range accurately

13   reflects his specific characteristics, Your Honor.  The base

14   offense level that was assigned to this case is due in part to

15   the purity level of the drugs and, in general, I believe that

16   the Sentencing Commission made it -- that offense level so

17   high because they think that the role of the person involved

18   is, you know, higher up on the totem pole.  But although

19   Mr. Quintero was involved in several transactions with the

20   undercover agent as well as Mr. La Shawn Ward, he doesn't know

21   any of the inner workings of the organization.  He's not high

22   up in the -- in the organization.  He -- his only role is to

23   do what people tell him to do and he doesn't have any access

24   to any suppliers or, you know, anything like that, and during

25   the time period that this conspiracy was started, really the

1   two people that you know about are really the only two people

2   that he was transacting with.

3           Mr. Quintero is nineteen years old now, Your Honor,

4   but at the time this conspiracy started, he was actually

5   seventeen years old when this conspiracy started.  So -- I

6   mean, he was essentially what would be considered to be a

7   juvenile at the time that this conspiracy started.

8           So although that doesn't take away any of his

9   responsibility for his role in this conspiracy, I think that

10   the Court should at least consider his age from that time

11   until now.  He's a relatively young man.

12           He had very good family ties, as you read from the

13   letters that we submitted.  He never brought drugs or guns or

14   anything that he was doing in his life-style around his

15   immediate family or his girlfriend.  He, you know, tried to

16   separate that and keep them -- keep them away from that

17   because he didn't want them to be involved in or some kind of

18   way be implicated in whatever it was that he was doing.

19           So although we realize that his offense level came

20   out to be very high, Your Honor, we don't think that

21   sentencing him within those guidelines would accurately

22   reflect everything that's really going on with Mr. Quintero,

23   so we would ask that the Court take everything into

24   consideration, the Presentence Report information that you

25   have there, his factual resume, the fact that he came in so

1    early to accept responsibility, the information that you've

2    heard from his girlfriend here today and the fact that, you

3    know, you have basically half a courtroom of people here that

4    are willing to come in and support Mr. Quintero, we would just

5    ask that you take all that into consideration and consider

6    giving him a downward departure or a variance in order to more

7    accurately reflect what's really going on here.

8         THE COURT:  Well, thank you.  Mr. Quintero, do you

9    wish to speak on your behalf or present information in

10   mitigation of your sentence?

11        THE DEFENDANT:  I just want to apologize for what I

12   did.  I apologize to my family and for putting them through

13   all this.  That's all.

14        THE COURT:  Okay.  Thank you, sir.  I will now state

15   the sentence determined pursuant to Title 18 U.S.C. § 3553

16   treating the Sentencing Guidelines as advisory only.

17        In arriving at a reasonable sentence, I've taken into

18   account primarily the conduct admitted in the factual resume

19   and those matters required to be considered by 3553.

20        The attorneys will have a final chance to make legal

21   objections before sentence is finally imposed.

22        It is the judgment of the Court that the Defendant,

23   Miguel Quintero, is hereby committed to the custody of the

24   Federal Bureau of Prisons for a period of 262 months.

25        Pursuant to the preliminary order of forfeiture, I

1    will order he forfeit all right, title, and interest in the

2    following property:

3           A 1986 Oldsmobile Cutlass; a Glock model 2340 caliber

4    handgun and ammunition; an FEG 7.62 .39 caliber rifle with

5    ammunition; a Bushmaster model XM15-E26 .223 caliber with

6    ammunition; a New England Arms 12 gauge shotgun; a Colt

7    Commander .45 caliber with ammunition;

8           I do not order a fine;

9           He is ordered to pay a mandatory special assess.

10   $100.

11          Upon his release from prison, he is placed on

12   supervised release for a term of 5 years.  It is further

13   ordered that upon his release from prison he comply with the

14   standard conditions contained in this judgment and with the

15   mandatory and special conditions contained herein.

16          He shall not commit another federal, state, or local

17   crime.

18          He shall not illegally possess controlled substances.

19          He shall cooperate in the collection of DNA as

20   directed by the probation officer.

21          He shall not possess a firearm, ammunition,

22   destruction device, or any other dangerous weapon.

23          He shall report in person to the Probation Office in

24   the district to which he is released within 72 hours of his

25   release.

He shall refrain from any unlawful use of a controlled substance.  Submit to one drug test within 15 days of his release from prison and at least two periodic drug tests thereafter, all as directed by his probation officer.

He shall participate in a program approved by the Probation Office for the treatment of narcotic drug or alcohol dependency which will include testing for the detection of substance use or abuse.

He shall abstain from the use of alcohol and/or all other intoxicants during and after completion of treatment and contribute to the cost of services rendered at a rate of at least $10 per month.

He shall participant in work force development programs and services involving activities relating to occupational and career development including, but not limited to, assessments and testing, educational instruction, training classes, career guidance, counseling, case management, and job search and retention services as directed by the probation officer until successfully discharged.

I believe a sentence within the guideline range is appropriate -- within this particular guideline range is appropriate because I believe that this sentence of 262 months is the appropriate sentence in this case, given all the facts and circumstances after applying the facts to the requirements of 3553.

1        What that means practically in my view is that if I'm

2    wrong on any of the objections that I've ruled on here today,

3    this is the sentence I otherwise would impose if there were no

4    guidelines at all and those rulings were irrelevant.

5        I believe this is the appropriate sentence even

6    within this guideline range.  I believe that at this level is

7    the appropriate sentence because Mr. Quintero did, as

8    Ms. Blacknall mentioned, did come in quickly, did plead

9    quickly, and he is nineteen years old.  Countering that

10   though, as the Government mentioned, is his role in this

11   offense, including all of the controlled purchases that were

12   described, the wire intercepts that, as I mentioned in

13   overruling the objections, I find that there was an arsenal of

14   firearms, ammunition, large capacity magazine, scopes,

15   ballistic vests are and a digital security system.  And so for

16   those reasons I believe this is the appropriate sentence,

17   given all of the fact and circumstances, in that this sentence

18   is sufficient but not greater than necessary to comply with

19   the statutory purposes of sentencing.

20       Is there any reason from the Government why that

21   sentence should not be imposed?

22       MR. KULL:  No, Your Honor.

23       THE COURT:  From the defense?

24       MS. BLACKNALL:  No, Your Honor.  But we do have

25   one -- one request, Your Honor.

1        **THE COURT:**  Yes, ma'am.

2        **MS. BLACKNALL:**  That Mr. Quintero be allowed to go to

3   a facility that is within the Dallas/Fort Worth area so that

4   he can be close with his family.  We would also note that

5   Mr. Quintero has a physical problem with his foot that was

6   noted in the Presentence Report and we understand that there

7   is a medical facility that he may be eligible to go to in Fort

8   Worth, so we just ask that he be -- remain in this area for

9   those two reasons, Your Honor.

10       **THE COURT:**  I will make that recommendation.

11  Mr. Quintero, that's a recommendation only.  The Bureau of

12  Prisons does not have to follow that recommendation.  They can

13  send you anywhere that meets their needs and your needs and

14  given that you have multiple codefendants, that will pose some

15  sort of challenge to them, but I will make that recommendation

16  and I'm sure they will consider my recommendation, but

17  ultimately the decision is theirs.

18       Is there a motion from the Government?

19       **MR. KULL:**  Judge, just for record purposes, I know

20  that in the preliminary of order of forfeiture in ECF 191,

21  No. 24 was listed as a Cold Commander .45 caliber.  The serial

22  number we had a "5" instead of an "S."  So, for record

23  purposes, the serial number on that Colt Commander the Court

24  just forfeited, No. 24 as listed on ECF 191, is 70SC16053.

25       **THE COURT:**  Okay.

1          **MR. KULL:**  And we move to dismiss count two in the

2     original indictment as to this defendant only.

3          **THE COURT:**  Okay.  The order of forfeiture will now

4     reflect the serial number that Mr. Kull has identified in the

5     record.  If for some reasonable you need -- for some reason

6     this becomes an issue, you will need to get this transcript

7     typed up and I will grant your motion to amend that order --

8     and/or the motion and then I will grant your motion to dismiss

9     as to this defendant only.  Anything else from the Defense?

10         **MS. BLACKNALL:**  No, Your Honor.

11         **THE COURT:**  Then, Mr. Quintero, you have the right to

12    appeal your sentence if you did not waive your right to

13    appeal.  And if you have the right to appeal, you also have

14    the right to apply for leave to appeal in forma pauperis if

15    you are unable to pay the costs of an appeal.  And if you

16    decide to appeal your notice must be filed within 14 days.

17         We are in recess on this case.  Thank you all for

18    being here and good luck to you, Mr. Quintero.

19

20

21

22

23

24

25

1        I, **DENVER B. RODEN**, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6        **WITNESS MY HAND** on this 29th day of November, 2013.

7

8

9                              /s/ Denver B. Roden

10                             **DENVER B. RODEN, RMR**
                               *United States Court Reporter*
11                             1050 Lake Carolyn Parkway #2338
                               Irving, Texas  75039
12                             *drodenrmr@sbcglobal.net*
                               **Phone:**  (214) 753-2298
13

14

15

16

17

18

19

20

21

22

23

24

25